Filed 1/11/16  Medrano v. Stratham Montecito West CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JAIME MEDRANO et al., | B260528 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC438377) |
| v. | |
| STRATHAM MONTECITO WEST et al., | |
| Defendants and Respondents. | |

———————————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Soussan G. Bruguera, Judge.  Reversed with directions.

Law Offices of Jerome Zamos and Jerome Zamos for Plaintiffs and Appellants.

Ulich, Ganion, Balmuth, Fisher & Feld, Andrew K. Ulich, Donald W. Fisher and Ivette Kincaid for Defendant and Respondent Stratham Montecito West.

Ericksen Arbuthnot, Lisa P. Gruen, Dale A. Arakawa and Gregory A. Mase for Defendants and Respondents Strategic Sales and Marketing Group and Jane Fowler Kelleher.

Lessley Law Firm and Rebecca H. Lessley for Defendants and Respondents Dora S. Cordero and Exodus Financial Group.

———————————————

**INTRODUCTION**

After purchasing a home, the plaintiff homebuyers sued the seller, brokers and agents involved for claims arising out of alleged misrepresentations regarding their monthly payments for principal, interest, taxes and insurance. The defendants filed demurrers, which the trial court sustained without leave to amend. The buyers appeal from the judgment subsequently entered.

As to Exodus Financial Group (Exodus) and Dora Cordero, we conclude the plaintiffs adequately stated fraud, failure to disclose and professional negligence claims. As to Stratham Montecito West (Stratham), Strategic Sales and Marketing Group (Strategic) and Jane Kelleher, we determine the plaintiffs stated a failure to disclose claim, but not a fraud or professional negligence claim. As to the fraud claim, however, we find there is a reasonable possibility that the defect can be cured by amendment. Finally, we find the plaintiffs have abandoned their claim for failure to supervise Spanish-speaking agents. Accordingly, we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

**A.** *The Fourth Amended Complaint*

Jaime and Maribel Medrano, the homebuyer plaintiffs, allege four causes of action in their operative complaint: (1) fraudulent inducement; (2) negligent failure to disclose facts materially affecting value or desirability of property; (3) failure to supervise

---

[1] Because this appeal challenges the trial court's order sustaining three demurrers without leave to amend, we set forth the relevant allegations of the operative (fourth amended) complaint and assume the truth of all properly pleaded facts and reasonable inferences drawn from those facts as we are required to do. (*Hambrick v. Healthcare Partners Medical Group, Inc.* (2015) 238 Cal.App.4th 124, 133, fn. 5; see *Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 916, fn. 1 [all properly pleaded allegations are deemed true, regardless of plaintiff's ability to later prove them].)

2

Spanish-speaking agents; and (4) professional negligence. The following facts are alleged in their fourth amended complaint:

Stratham is engaged in residential real estate development, marketing and sales. Both Strategic and Exodus are licensed real estate brokers. Jane Kelleher is a licensed real estate agent associated with Strategic, and Dora Cordero is a licensed real estate agent with Exodus. Stratham and Strategic engaged Exodus and Cordero to locate prospective buyers for a subdivision of single family residences in Lancaster and to assist as the designated lender in marketing the subdivision. Strategic, Exodus, Kelleher and Cordero are all sales agents of Stratham.

In May 2009, Cordero solicited the Medranos to purchase a new single family residence, representing herself to be a professional with experience in assisting distressed homeowners faced with the threat of foreclosure.[2] During their conversations in May 2009, the Medranos shared with Cordero the status of their loan modification discussions with their lender as well as their financial records. Cordero advised the Medranos she could help them purchase and finance a new home in the Lancaster subdivision based on the financial information they had provided.

Cordero counseled the Medranos to: (1) allow her and her broker Exodus to negotiate on their behalf with lenders regarding all financing required to resolve their financial concerns; (2) meet with Stratham and Strategic's sales agent Kelleher at Stratham's sales office in Lancaster; and (3) cease making further payments on their current residence.

The Medranos then accompanied Cordero to Stratham's sales office in May 2009 where they met with Kelleher. The Medranos are Spanish speakers who do not understand English. During the meeting, through Cordero's Spanish language

---

[2]    The complaint alleged Cordero was acting on behalf of Stratham, Strategic and Exodus. The Medranos told Cordero they were attempting to avoid the foreclosure of their home by negotiating directly with their lender to reduce their monthly housing payments through a modification program. The lender had not commenced foreclosure proceedings.

translation, Kelleher assured the Medranos that by purchasing the Lancaster property instead of modifying the loans against their current residence, their monthly payments for principal, interest, taxes and insurance could be reduced. In their discussions with Cordero and Kelleher, the Medranos were told Kelleher would prepare a purchase agreement reflecting terms and conditions Cordero orally described to them. More specifically, Kelleher assured the Medranos their monthly payments for principal, interest, taxes and insurance would not exceed $1,917.68 pursuant to the documents she would instruct Stratham's escrow agents to prepare. The Medranos made clear to Cordero and Kelleher (1) their unwillingness to enter into any agreement which would cause their monthly housing expenses to exceed this amount ($1,917.68) following close of escrow, (2) their desire to avoid the loss of their family residence through foreclosure, and (3) their limited financial resources.

On or about May 30, 2009, when Kelleher presented the residential purchase agreement for signature, she assured the Medranos (through Cordero's translation) the document accurately reflected the terms and conditions Cordero had orally described in Spanish. Kelleher told the Medranos "their monthly payments for principal, interest, taxes and insurance would not exceed [the] agreed sum of . . . $1,917.68 . . . following close of escrow."

The Medranos were not provided with a Spanish translation of any of these documents. They relied on the translation and explanation of the content and meaning of the documents Kelleher and Cordero provided, because the Medranos were unable to read documents written in English.

Cordero and Kelleher led the Medranos to believe the agreement was for their benefit, and they would avoid the prospect of losing their current home through foreclosure. Jaime only executed the residential purchase agreement and loan documents after Cordero and Kelleher assured monthly payments for principal, interest, taxes and

4

insurance would not exceed $1,917.68.[3]  The Medranos never would have purchased the Lancaster residence from Stratham (or transferred title to their prior residence in the short sale the defendants arranged) had they been advised that shortly after the purchase their monthly payments would be increased to $2,676.06.

About six months after Cordero's and Kelleher's advice and close of escrow, their loan servicer informed the Medranos their monthly payments would be increased by $758.38 to $2,676.06.

As real estate professionals, Strategic, Exodus, Kelleher and Cordero knew or should have known the manner in which the Medranos' property taxes would be calculated following close of escrow and knew the monthly installments the Medranos would be obligated to pay.  As a result of the defendants' actions, the Medranos lost their $4,000 initial deposit, their $16,808 additional deposit, their monthly payments in the amount of $1,917.68 and then their home through foreclosure, in addition to incurring attorney's fees among other damages.

**B.  *The Demurrers, Hearing and Ruling on the Fourth Amended Complaint***

Stratham, Strategic and Kelleher, and Exodus and Cordero filed demurrers arguing that the fourth amended complaint contained allegations inconsistent with the Medranos' prior pleadings.  The defendants referred to a prior version of the complaint wherein the Medranos alleged $1,917.68 was the correct monthly payment amount, but because of their loan servicer's miscalculation the amount was *later* increased.  Thus, pursuant to the Medranos' prior pleadings, the defendants were not the cause of any loss by the Medranos and the amended pleading naming them as defendants was a sham.

The defendants also asserted the Medranos could not state a cause of action against them based on their future property tax obligations pursuant to *Holder v. Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91, 106-107 (*Holder*).

---

[3]     The Medranos would use an impound escrow account with the lender to collect real property taxes and insurance on a monthly basis.

During the demurrer hearing, counsel for the Medranos represented he was prepared to amend the complaint to add allegations based on information learned in discovery after the filing of the fourth amended complaint. Counsel informed the court, based on information concerning an earlier cancelled escrow, he could allege Stratham and Strategic knew the correct amount of real property taxes the Medranos would be required to pay, and Stratham and Strategic made the decision to misquote the amount of taxes to be paid—either intentionally or negligently. He argued as Exodus undertook to address the Medranos' financial concerns, brought the Medranos to the sale transaction, acted as the mortgage broker and made all of the arrangements with the lender, Exodus was liable as it was obligated to explain all of the relevant terms of the financing.

The Medranos' counsel argued "[t]he whole source of the damage" was the defendants' miscalculation of the amounts to be impounded which led the Medranos to believe their monthly payments would be about $1,900. Using the correct amount of taxes Stratham actually paid in 2008 and 2009, all of the defendants would have known the monthly payment to which the Medranos agreed would result in a deficiency, authorizing the loan servicer to later increase the Medranos' monthly payments by almost $800 for the impound escrow account. Counsel argued this was the essence of the original verified complaint and every iteration thereafter. He claimed these facts supported the Medranos' claims for intentional misrepresentation, negligent misrepresentation and breaches of duty under California law. According to the Medranos' counsel, the Medranos could now see that Stratham "consciously withheld" the correct amount of taxes because it had even withheld the correct tax amount from the multiple listing service as a "magnet" to draw people in.

After hearing argument and taking the matter under submission, the trial court sustained all three demurrers without leave to amend. The court struck the second cause of action for negligent failure to disclose material facts, and the fourth cause of action for professional negligence, on its own motion, finding both exceeded the scope of amendment permitted after the defendants' demurrers to the third amended complaint were sustained with leave to amend. As to the first cause of action for fraudulent

6

inducement, and the third cause of action for failure to supervise, the trial court found the Medranos had failed to allege sufficient facts to constitute these causes of action.

More particularly, the trial court found the Medranos had failed to allege the elements of fraud with the requisite specificity, "especially in light of the conflicting allegations set forth in [their] prior pleadings." As to the third cause of action for failure to properly supervise Spanish-speaking agents, the court indicated the complaint alleged Cordero and Kelleher were agents of Exodus and Strategic, not Stratham, and the plaintiffs had failed to allege facts showing Strategic, Exodus and Stratham had reason to believe undue risk of harm or damages would result from the agents' employment.

The Medranos appeal from the judgment of dismissal subsequently entered.

## DISCUSSION

### A. *Standard of Review*

In reviewing a trial court's order sustaining a demurrer, "we independently evaluate whether the operative complaint states facts sufficient to state a cause of action." (*Alborzian v. JPMorgan Chase Bank, N.A.* (2015) 235 Cal.App.4th 29, 34; accord, *AIDS Healthcare Foundation v. State Dept. of Health Care Services* (2015) 241 Cal.App.4th 1327, 1336.) "When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.]' [Citation.]" (*Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1136-1137.)

**B.** *The First Cause of Action: Fraudulent Inducement*[4] *(All Defendants)*

Exodus and Cordero as well as Strategic and Kelleher argue the trial court was correct in sustaining their demurrers to the fraudulent inducement cause of action without leave to amend because (1) the Medranos did not allege fraud with the required specificity, (2) the alleged misrepresentations were correct, and (3) a fraud claim may not be based on statements of future action by third parties.

Making similar arguments, Stratham contends it has no liability for the increase in payments, and the Medranos could not justifiably rely on representations regarding property taxes under *Holder*, *supra*, 267 Cal.App.2d at pages 106-107. Unlike the other defendants, Stratham does not argue that the Medranos' fraud claim suffers from a lack of specificity.

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

1. *Specificity*

Fraud must be plead with specificity; "'general and conclusory allegations do not suffice.'" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184.) This specificity requirement means "a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made, and, in the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made." (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793.)

---

[4]    While labeled as a claim of fraudulent inducement, the parties concede that the Medranos are alleging fraud. Accordingly, we analyze it in the same manner.

We enforce the specificity requirement guided by its two purposes: (1) "to give notice to the defendant with sufficiently definite charges that the defendant can meet them" and (2) in an effort to weed out meritless fraud claims, "'"'to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud.'"'" [Citation.]" (*West v. JPMorgan Chase Bank, N.A.*, *supra*, 214 Cal.App.4th at p. 793; *Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 649 [facts constituting the alleged fraud must be pled with "sufficient specificity to allow [the] defendant to understand fully the nature of the charge made"].)

### a.  *As to Cordero and Exodus*

The Medranos allege Cordero,[5] who arranged the financing for the transaction, told them their monthly payments of $1,917.68 would not increase, and would cover the monthly obligations for principal, interest, taxes and insurance when this was not true. Cordero made the misrepresentation to induce the Medranos to purchase the house so she could obtain a commission for the sale. The Medranos justifiably relied on Cordero because she represented herself to them not only as a real estate agent, but also as a professional with particular expertise in assisting distressed homeowners in avoiding foreclosure; she told the Medranos she and her broker would work on their behalf to negotiate financing that would resolve their financial concerns. Because they relied on Cordero's misrepresentations, they suffered damages. They lost their deposits (totaling $20,808), the monthly payments they made of $1,917.68 and ultimately their home among other damages.

---

5       The Medranos allege Cordero is a real estate agent associated with Exodus as broker. Therefore, we include Exodus in our references to Cordero as "[i]t is settled that for purposes of liability to third parties for torts, a real estate salesperson is the agent of the broker who employs him or her. The broker is liable as a matter of law for all damages caused to third persons by the tortious acts of the salesperson committed within the course and scope of employment." (*California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1581; see also Civ. Code, § 2079.13, subd. (b).)

Cordero and Exodus argue it is "impossible" to tell when, where and how the representations were made, notwithstanding the "amazingly detailed allegation" regarding the payment amount. We disagree. The Medranos allege that Cordero assured them when they met with her and Kelleher at Strategic's office in Lancaster in May 2009 that $1,917.68 would cover principal, interest, taxes and insurance, and the documents prepared to accomplish the transaction would not require payments exceeding this amount. They allege that on multiple occasions, including just before Jaime Medrano signed the purchase agreement on May 30, 2009, and before they signed the loan documents to complete the transaction thereafter, Cordero reconfirmed the documents written in English described the transaction to which they had orally agreed. (See *Smith v. Home Loan Funding, Inc.* (2011) 192 Cal.App.4th 1331, 1338.)

The Medranos, however, fail to allege that Cordero and Exodus knew their representation concerning the monthly payments was false. Despite this omission, based on the alleged broker/buyer relationship as well as the specific allegations concerning the other elements of fraud, the Medranos' operative complaint supports a claim against Exodus and Cordero for constructive fraud. (Civ. Code, § 1573.)

"'Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship.' [Citation.] [¶] '. . . Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. Also, a *careless misstatement* may constitute constructive fraud even though there is no fraudulent intent.' [Citation.]" (*Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 562, italics added and omitted.)

While the Medranos have not alleged Exodus and Cordero knew that their representation concerning the monthly payment amount was false, they do allege that Exodus and Cordero knew, or should have known, that the representation was wrong. As alleged, Exodus and Cordero had undertaken to represent the Medranos' financial interests in the transaction. Exodus and Cordero are real estate professionals who knew

10

how real estate taxes are calculated and recalculated upon sale.  Through such allegations as well as all of the other specific allegations they made concerning fraud, the Medranos stated a claim against Exodus and Cordero for constructive fraud.

### b. *As to Stratham, Strategic and Kelleher*

The Medranos alleged that Exodus, Cordero, Strategic and Kelleher are all agents acting on behalf of Stratham.  Stratham enlisted all of its agents to assist it in disposing of its excess inventory in its Lancaster subdivision.

The Medranos further alleged that Stratham's agent, Kelleher,[6] made the same representation as Cordero.  The Medranos went to Stratham's sales office in late May 2009 where Kelleher assured them, with Cordero translating, that their monthly payments for the property would not exceed $1,917.68.  Kelleher stated that the documents she prepared, or instructed escrow agents designated by Stratham to prepare, would reflect her representation about their monthly payment.  She informed the Medranos that by purchasing a new home from Stratham rather than modifying the loan on their then current home, the Medranos could reduce their monthly property payment.  On May 30, 2009, Kelleher advised the Medranos that the purchase contract she presented for their signature reflected the transaction that she had previously discussed with them.  Like Cordero, as a real estate agent, Kelleher knew or should have known how property taxes were calculated.  Kelleher was working with Cordero on Stratham's behalf to dispose of its excess inventory and would benefit financially from the sale.  Stratham and its agents intended to have the Medranos rely on representations about the monthly payment amount to facilitate the sale.  The Medranos believed the transaction was for their benefit

---

6      The Medranos allege Kelleher is a real estate agent associated with Strategic, a real estate broker.  We include Strategic in our references to Kelleher as we did with Cordero and Exodus.  Additionally, as a principal, Stratham "is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction . . . ."  (Civ. Code, § 2338.)

and justifiably relied on Stratham's agent Kelleher as she was a real estate professional assisting them with the purchase and assuring them their monthly payment limits could be met. Because they relied on Kelleher's misrepresentations, they suffered damages.

As with Exodus and Cordero, the Medranos do not specifically allege in their operative complaint that Strategic and Kelleher knew their representations on behalf of Stratham were false. Further, the Medranos have not alleged a fiduciary or confidential relationship between them and Stratham or Strategic and Kelleher, the selling broker/agent, and therefore they cannot rely on a constructive fraud theory. Thus, the court properly sustained the demurrer as to Strategic and Kelleher on the grounds that the Medranos did not allege all of the elements of fraud with specificity; they did not plead knowledge of the falsity of the representation.

During argument on the demurrer, the Medranos' counsel indicated he could supplement the Medranos' allegations to allege actual knowledge of the falsity of the representation by Stratham, Strategic and Kelleher. Counsel argued that Stratham, Strategic and Kelleher all intentionally withheld the correct amount of real property taxes the Medranos would be required to pay based on discovery that had recently been conducted. Given the argument, it appears there is a reasonable possibility that the defect can be cured by amendment. The court's failure to grant leave to amend was therefore error.[7]

2. *The Sham Pleading Doctrine Does Not Undermine the Alleged*
   *Misrepresentation*

All of the defendants argue the Medranos cannot state a claim for fraud because they alleged in prior versions of their complaint that $1,917.68 was the *correct* monthly

---

[7] While Stratham did not challenge the fraud claim based on a lack of specificity, given that the Medranos can allege, based on counsel's representations made during the hearing on the demurrer, knowledge of falsity as to both the seller and seller's agents, we believe it is consistent with judicial economy to permit the Medranos leave to amend as to that element of their fraud claim as to Stratham.

payment amount, but their loan servicer later improperly demanded payments of $2,676.06 due to the loan servicer's miscalculation.[8] In Stratham's words, the Medranos received what they were promised—a total monthly payment of $1,917.68, comprised of approximately $1,400 principal and interest, $60 hazard insurance, $110 private mortgage insurance and $210 in property taxes—"exactly what [the Medranos] allege they were told;" if not for the loan servicer's miscalculation, the defendants argue, this action never would have been filed and they would have no liability.[9]

An amended pleading ordinarily supersedes prior pleadings, but an exception is found "'''"where an amended complaint attempts to avoid defects set forth in a prior complaint by ignoring them."'''" (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 343.) A "'''"court may examine the prior complaint to ascertain whether the amended complaint is merely a sham." [Citation.] . . . Moreover, any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations. [Citation.]'" (*Ibid*.; see *State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 412 ["'[u]nder the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment'"].)

In their original complaint, the Medranos sued defendants along with their loan servicer alleging defendants had assured them that their monthly payments for principal, interest, taxes and insurance would not exceed $1,917.68, but the loan servicer informed them in March 2010 that their payments would increase to $2,676.06. This allegation by

---

[8]     They argue this allegation is fatal to all of the claims against the defendants.

[9]     More precisely, according to exhibits attached to prior versions of the complaint, the Medranos' payments of $1,917.68 were directed as follows: $1,483.12 for principal and interest, $110.81 for private mortgage insurance and $62.42 for hazard insurance, leaving $261.33 for property taxes.

13

the Medranos is consistent throughout all versions of the complaint and the central premise of their lawsuit.[10]

Subsequently, in a first amended complaint naming the loan servicer as the only defendant, the Medranos alleged the "sole and exclusive reason" for the deficiency in their impound escrow account was the loan servicer's error in calculating the correct amount of impound and the servicer's overpayment of property taxes due. The Medranos based this erroneous conclusion on the notice of supplemental assessment from the Los Angeles County Tax Assessor dated November 5, 2009 (attached as an exhibit) indicating the property's assessed value had *decreased* from $344,237 to $252,000 (the Medranos' purchase price), a net difference of $92,237. Despite this decrease in property value, the loan servicer had demanded a 275 percent increase in the Medranos' monthly impound payment from $434.56 per month to $1,192.96.

We reject the argument the fourth amended complaint is a sham based on the Medranos' prior allegations that $1,917.68 was the correct monthly payment and the loan servicer was solely at fault. (*Larson v. UHS of Rancho Springs, Inc.*, *supra*, 230 Cal.App.4th at p. 344.) "'The sham pleading doctrine is not "'intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts.'" [Citation.] Instead, it is intended to enable courts "'to prevent an abuse of process.'" [Citation.]' [Citations.]" (*Ibid*.)

Here, the Medranos have alleged they understood they were executing documents obligating them to make monthly payments in the amount of $1,917.68 with the

---

10    The Medranos argue the "'one wrongful act'" they have alleged "in all of their pleadings is the failure . . . to properly disclose the impact that the inclusion of taxes would have on [their] monthly obligations if they purchased the [property] . . . in July of 2009." In essence, in the trial court and on appeal, the Medranos have explained they did not initially understand why, in a matter of a few months, their monthly payments increased by almost $800, but they purchased the Lancaster property "in reliance on [defendants'] preclosing representations in May 2009 that their monthly payment of $1,917.68 was properly calculated to cover 'the existing taxes' assessed against the property" when defendants knew (or should have known) they were not.

understanding this sum would cover principal, interest, property taxes and insurance when this was not the case; the exhibits attached to the Medranos pleadings establish that, notwithstanding their earlier misimpression that the loan servicer was the cause of the deficiency in their escrow impound account, their complaint is not a sham.[11]  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [we give "the complaint a reasonable interpretation," reading it as a whole and its parts in context].)  Nothing suggests that the Medranos' prior erroneous conclusion concerning the loan servicer's liability was made in bad faith or that the Medranos were engaged in an abuse of process.  (See *Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 751.)  Instead, "read in context, it appears [the Medranos were] omitting an alternate factual allegation [concerning the loan servicer's sole responsibility] that had proven to be erroneous."  (*Ibid.*)

3. *The Holder Case and Misrepresentations as to Existing Facts*

Defendants argue the Medranos' claim against them is not actionable as they could not justifiably rely on any prediction concerning the amount of real property taxes they

---

[11]    Exhibits attached to different versions of the complaint support the Medranos' consistent allegation that they were promised their monthly payment for principal, interest, taxes and insurance would not exceed $1,917.68 when that was never the case.

The final settlement statement also attached to the Medranos' first amended complaint indicates property taxes due at a rate of $18.338 per day (or $6,601.68 per year).  In other words, the allocation of only $261.33 per month for property taxes out of the $1,917.68 payment was insufficient from the outset—before the loan servicer ever took over the servicing of the loan from the original lender.  Dividing the $6,601.68 annual property tax amount due by 12 and adding the required two-month cushion under the law governing maintenance of impound accounts, the Medranos were obligated to pay $641.83 per month ($550.14 plus $91.69) for property taxes to remain current on their loan.  The Medranos allege, as real estate agents and brokers, Cordero and Exodus and Kelleher and Strategic knew the formula for calculating property taxes.  Yet, working together with Stratham to dispose of its excess inventory, the Medranos allege defendants arranged a transaction that effectively set them on a path to foreclosure.  With each payment of $1,917.68, the Medranos would and did grow further behind in their actual obligation on their loan.

15

would be required to pay in the future. They rely on *Holder*, *supra*, 267 Cal.App.2d 91 for support. Defendants misunderstand the Medranos' allegations.

*Holder* provides: "In general, reliance may be made by a buyer of real estate upon representations as to existing tax liens, amounts of taxes for current or prior years, or assessed values for current or former years. [Citations.] [¶] . . . [S]uch reliance may be justifiable even though the purchaser fails to consult the public records from which the fact might be ascertained. There is authority to the contrary where there is no relation of trust and confidence [citation]. [¶] Whether in a particular case the purchaser relied or had a right to rely is a matter of fact depending upon the particular circumstances, including the language in which the representation is couched. [Citations.]

"The rule is different as to statements with regard to future assessments or levies of taxes. The fixing of assessed values of property and of tax rates is solely within the power of public officials, whose decisions are not and should not be subject to control by a property owner, so that representations made by a private person as to such matters may not justifiably be relied on. [Citations.]" (*Holder*, *supra*, 267 Cal.App.2d at pp. 106-107, fn. omitted; see also *Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 769 ["'it is inherently unreasonable for any person to rely on a prediction of future IRS enactment, enforcement, or non-enforcement of the law by someone unaffiliated with the federal government'": "'the reasonable reliance element of any fraud claim based on these predictions fails as a matter of law'"]; *Borba v. Thomas* (1977) 70 Cal.App.3d 144, 152, 154 [statement there would be "'no problem'" in getting Bureau of Reclamation approval of the purchase price was merely a nonactionable expression of opinion; "[a]bsent some special relationship between the parties, a private person is not entitled to rely on the opinion of another private person concerning the future decisions of a public body"].)

For the reasons already described, *Holder* actually supports the Medranos. The Medranos' allegations implicate the general rule that a buyer may rely upon representations as to tax amounts for current and prior years (and assessed values for current and former years). (*Holder*, *supra*, 267 Cal.App.2d at p. 106.) The Medranos

16

alleged that defendants assured them that their monthly payments due after the close of escrow would not exceed $1,917.68. The monthly payment contemplated current tax obligations. Moreover, whether the Medranos relied or had a right to rely is a question of fact "depending upon the particular circumstances, including the language in which the representation is couched."[12] (*Ibid.*)

To the extent defendants argue the Medranos' claims are barred as they are based on future actions by a third party and are non-actionable opinions (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469 [forecasts regarding the future of the real estate market are not actionable misrepresentations as they are forecasts of future events]), we disagree.

Under the authorities defendants rely upon, "exceptions to the general rule that, to be actionable, a misrepresentation must be of an existing fact, not an opinion or prediction of future events," arise "'(1) where a party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge; (2) where the opinion is by a fiduciary or other trusted person; (3) where a party states his opinion as an existing fact or as implying facts which justify a belief in the truth of the opinion. [Citation.]' [Citation.]" (*Brakke v. Economic Concepts, Inc.*, *supra*, 213 Cal.App.4th at p. 769; accord, *Borba v. Thomas*, *supra*, 70 Cal.App.3d at p. 152.) Accepting the Medranos' allegations as true as we must, it appears the Medranos meet at least two of the three exceptions.[13]

Based on the foregoing, we find the trial court erred in sustaining the demurrer of Exodus and Cordero to the Medranos' fraud claim. We agree the trial court properly

---

[12]     *Holder* is further distinguishable in that it addressed the obligation of a lender while the Medranos allege facts supporting the conclusion Cordero acted as their mortgage broker and agent and therefore owed them a fiduciary duty. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 782; *Smith v. Home Loan Funding, Inc.* (2011) 192 Cal.App.4th 1331, 1335.)

[13]     All three exceptions require factual determinations and cannot be resolved on demurrer.

sustained the demurrer to the fraud claim as to Stratham, Strategic and Kelleher, but find that it was an abuse of discretion to do so without leave to amend based on counsel's representations during the hearing that he could allege those defendants had actual knowledge of the falsity of the representations.

## C. *The Second Cause of Action: Negligent Failure To Disclose Facts Materially Affecting the Value or Desirability of Property (All Defendants)*

The trial court struck the second cause of action on the ground the claim exceeded the scope of amendment permitted by the court's prior order sustaining the demurrers to the third amended complaint with leave to amend. The Medranos argue their second cause of action was an attempt at refining their pleading. They explain when the court sustained the demurrers to the third amended complaint with leave to amend, the trial court noted the first cause of action for fraudulent inducement was actually two causes of action, a claim for fraud and a claim for nondisclosure.

In their operative complaint, the Medranos addressed the concern noted by the trial court. They separated their fraudulent inducement claim into two claims based on the allegations. Instead of alleging only fraudulent inducement, the operative complaint alleged fraud based on misrepresentation as well as a claim for nondisclosure. We consider the second cause of action to be responsive to the deficiencies the court noted in the prior pleading. Accordingly, the court should have addressed this cause of action on its merits. (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1015.)

In opposing the demurrer to this cause of action, relying on *Holmes v. Summer* (2010) 188 Cal.App.4th 1510, and cases cited therein, the Medranos note: "'It is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer. [Citations.]' [Citations.] When the seller's real estate agent or broker is also aware of such facts, 'he [or she] is under the same duty of disclosure.' [Citation.] A real estate

18

agent or broker may be liable 'for mere nondisclosure since his [or her] conduct in the transaction amounts to a representation of the nonexistence of the facts which he has failed to disclose [citation].'  [Citation.]"  (*Id*. at pp. 1518-1519, italics omitted; cf. Civ. Code, § 2079, subd. (a).)

This duty to disclose applies not only to a seller and the seller's agent, but to the buyer's broker as well.  A buyer's broker can be liable for misrepresentations he or she passes on to the buyer from a seller that are material to the buyer's decision to buy the property.  (*Salahutdin v. Valley of California, Inc*, *supra*, 24 Cal.App.4th at pp. 561-563 [buyer's agent failed to verify the accuracy of information concerning size of property and its ability to be subdivided].)

According to the allegations of their complaint, all defendants assured the Medranos they could rely on the stated monthly payment to cover their monthly housing costs, and the Medranos made it clear to defendants that they were unwilling and unable to make a higher payment.  Although defendants knew or should have known the manner in which property taxes were calculated, they withheld from the Medranos the fact this calculation meant their agreed payments were insufficient.  The trial court should have overruled defendants' demurrer to this cause of action.

**D.  *The Third Cause of Action: Failure To Supervise Spanish-Speaking Agents (Stratham, Strategic and Exodus)***

The Medranos fail to address the third cause of action in their opening brief; we therefore consider it abandoned.  (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 630 ["while our review of the order sustaining the demurrer is de novo, it is limited to issues adequately raised and supported in [the appellant's] brief"]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [issues not raised in an appellant's brief are deemed waived or abandoned].)

As defendants argued and the trial court found, the Medranos failed to allege these defendants had reason to believe an undue risk of harm would exist because of Cordero's

employment—a necessary element of a cause of action for negligent supervision. (*Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1214.)

**E.** *The Fourth Cause of Action: Professional Negligence (Strategic, Kelleher, Exodus and Cordero)*

As with the second cause of action, the trial court struck the fourth cause of action on the ground the claim exceeded the scope of amendment permitted by the court's prior order sustaining the demurrers to the third amended complaint with leave to amend. Again, the Medranos argue they were further refining their pleading in an attempt to respond to the court's prior order sustaining the demurrers to their third amended complaint. Instead of alleging breach of fiduciary duty as they had done previously, they restated it as a professional negligence claim.

As with the second cause of action, we consider the fourth cause of action to be responsive to the deficiencies the court noted in connection with the prior pleading. Accordingly, the court should have addressed this cause of action on its merits. (*Patrick v. Alacer Corp.*, *supra*, 167 Cal.App.4th at p. 1015.)

"To state a cause of action for professional negligence, a party must show '(1) the duty of the professional to use such skill, prudence and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence.' [Citation.] 'The threshold element of a cause of action for negligence is the existence of a [legal] duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion.' [Citation.] 'Where there is no legal duty, the issue of professional negligence cannot be plead because with the absence of a breach of duty, an essential element of the cause of action for professional negligence is missing.' [Citation.]" (*Giacometti v. Aulla, LLC*, *supra*, 187 Cal.App.4th at p. 1137.)

As the Medranos' broker and agent, Exodus and Cordero had a duty to disclose information to the Medranos that was material to their decision to purchase the property.

20

"'The agent's duty to disclose material information to the principal includes the duty to disclose reasonably obtainable material information. [¶] . . . [¶] The facts that a broker must learn, and the advice and counsel required of the broker, depend on the facts of each transaction, the knowledge and the experience of the principal, the questions asked by the principal, and the nature of the property and the terms of sale. The broker must place himself in the position of the principal and ask himself the type of information required for the principal to make a well-informed decision. The obligation requires investigation of facts not known to the agent and disclosure of all material facts that might reasonably be discovered.' [Citation.]" (*Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18, 25-26.)

The Medranos sufficiently alleged a claim against Exodus and Cordero for professional negligence.[14] They alleged Exodus and Cordero breached their duty in failing to disclose material facts concerning the monthly amount of real estate taxes they would be required to pay after purchasing the property. The breach, according to the allegations, resulted in damages to the Medranos.

As to Stratham, Strategic and Kelleher, however, the Medranos did not allege a duty (other than the general duty of disclosure that is asserted in the failure to disclose claim) to support a professional negligence claim.[15] This lack of duty is fatal to the Medranos' professional negligence claim as to Stratham, Strategic and Kelleher, and the trial court properly sustained their demurrer to it. Given the Medranos' inability to suggest it was reasonably possible they could cure the defect by amendment, the trial court properly denied the Medranos leave to amend as to this claim.

---

[14]    "[T]he disclosure duty is a general duty imposed on the agent, and whether a breach of that duty constitutes negligence or fraud depends on the particular circumstances of each case. [Citation.]" (*Salahutdin v. Valley of California, Inc.*, *supra*, 24 Cal.App.4th at p. 563.)

[15]    During oral argument, in response to questioning, counsel did not identify any other duty running to the Medranos from the seller and its agents. The Medranos' claim for failure to disclose is set forth as their second cause of action.

# DISPOSITION

The judgment of dismissal is reversed.  The trial court is directed to vacate its order sustaining defendants' demurrers to the fourth amended complaint and to enter a new order: (1) as to the first cause of action for fraudulent inducement, overruling the demurrer of Exodus and Cordero and sustaining with leave to amend the demurrers of Stratham, Strategic and Kelleher; (2) as to the second cause of action for negligent failure to disclose, overruling the demurrers of all defendants; (3) as to the third cause of action for failure to supervise, sustaining the demurrers of Stratham, Strategic and Kelleher without leave to amend; and (4) as to the fourth cause of action for professional negligence, overruling the demurrer of Exodus and Cordero and sustaining without leave to amend the demurrers of Stratham, Strategic and Kelleher.  The Medranos are to recover their costs on appeal.

BECKLOFF, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.